[Cite as *In re S.B.*, 2012-Ohio-991.]

STATE OF OHIO )
)ss:
COUNTY OF MEDINA )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: S.B.

C.A. No.     11CA0095-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.     2010 06 NE 0022

DECISION AND JOURNAL ENTRY

Dated: March 12, 2012

BELFANCE, Judge.

{¶1}    Appellant, Andrea P. ("Mother"), appeals from a judgment of the Medina County Court of Common Pleas, Juvenile Division, that terminated her parental rights to one of her minor children and placed the child in the permanent custody of Medina County Job and Family Services ("MCJFS"). For the reasons that follow, we affirm.

I.

{¶2}    Mother is the natural mother of S.B., born December 11, 2009.   On June 14, 2010, MCJFS filed a complaint, alleging that six-month-old S.B. was a dependent and neglected child because Mother had left him in the care of unrelated adults whom she barely knew and the condition of her home was unsafe and unsanitary. On July 19, 2010, Mother stipulated to an adjudication of dependency and the allegation of neglect was dismissed.

{¶3}    Mother has an older child, A.P., who is the subject of a separate child dependency case with MDJFS.  That child was removed from Mother's custody more than one year before

S.B. was born, and apparently has never been returned to Mother's home. The agency's primary concerns about Mother's ability to provide a suitable home for her children are her mental illness, which she has been unable to stabilize through treatment and medication, and the lack of cleanliness and stability in her home, including her repeated pattern of allowing people to stay in her home who have violent and/or criminal histories or otherwise pose a threat to her children. According to Mother's original caseworker, her inability to control her emotions has also led to her involvement in criminal activity, which resulted in convictions of child endangering, cruelty to animals, and receiving stolen property during the first few months of the case planning period.

{¶4} At the age of 16, Mother was first diagnosed with bipolar disorder, a diagnosis that mental health professionals have confirmed repeatedly. Although she has apparently received psychiatric treatment and taken a variety of medications since then, she has been unable to consistently stabilize her extreme mood swings, which has resulted in repeated psychiatric hospitalizations. More recently, Mother has also been diagnosed with panic disorder, post-traumatic stress disorder, and borderline personality disorder. She also has a long history of cutting herself as a self-harming behavior.

{¶5} Throughout this case, Mother was inconsistent with her mental health treatment and continued to have extreme mood swings. According to MJCFS, she also continued her pattern of exercising poor judgment by involving herself with inappropriate men and allowing them and others to stay at her home on a regular basis. Consequently, on May 12, 2011, MCJFS moved for permanent custody of S.B. It alleged that permanent custody was in the best interest of S.B. and that he could not be returned to Mother's care within a reasonable time or should not be returned to her based on four alternate factors under R.C. 2151.414(E)(1), (2), (4), and (6). S.B.'s father, who is not a party to this appeal, also filed a motion for legal custody.

{¶6} Following a hearing on both dispositional motions, the trial court found that S.B. could not be placed with Mother within a reasonable time or should not be placed with her, based on each of the alternate grounds alleged by MCJFS, and that permanent custody was in his best interest. Consequently, it terminated Mother's parental rights and placed S.B. in the permanent custody of MCJFS. Mother appeals and raises one assignment of error.

II.

THE TRIAL COURT'S TERMINATION OF MOTHER'S PARENTAL RIGHTS AND GRANTING PERMANENT CUSTODY OF THE CHILD TO [MCJFS] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, WHERE AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT SUCH A JUDGMENT WAS IN THE BEST INTEREST OF THE CHILD.

{¶7} Mother's sole assignment of error is that the trial court's permanent custody decision was against the manifest weight of the evidence. Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and (2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶8} The trial court found that S.B. could not be placed with Mother within a reasonable time or should not be placed with her based on the existence of four factors set forth in R.C. 2151.414(E). Specifically, the trial court based its conclusion on its findings that: Mother had failed to substantially remedy the conditions that had caused S.B. to be placed

outside her home, R.C. 2151.414(E)(1); she suffered from a chronic mental illness that prevented her from providing an adequate home for S.B. at that time or within the next year, R.C. 2151.414(E)(2); she demonstrated a lack of commitment to S.B. by failing to support him, R.C. 2151.414(E)(4); and she had been convicted of the offense of child endangering and S.B.'s half-sibling, A.P., was the victim of that offense, R.C. 2151.414(E)(6). Mother does not dispute any of the trial court's findings on the R.C. 2151.414(E) factors. Instead, she confines her challenge on appeal to the trial court's finding that permanent custody was in the best interest of S.B.

{¶9} When determining whether a grant of permanent custody is in a child's best interests, the juvenile court must consider the following factors:

> The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]

R.C. 2151.414(D)(1)(a)-(d).[1]

{¶10} Mother argues that the trial court's best interest finding was against the manifest weight of the evidence. When evaluating whether a judgment is against the manifest weight of the evidence in a permanent custody case, this Court reviews the entire record and:

> "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that

---

[1] The factor set forth in R.C. 2151.414(D)(1)(e) is not relevant in this case.

the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the [judgment]."

*State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). Accordingly, before reversing a judgment as being against the manifest weight of the evidence in this context, this Court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice. *See In re M.C.*, 9th Dist. No. 24797, 2009-Ohio-5544, ¶ 8, 17.

{¶11} Mother's interaction with S.B. during the 14 months prior to the permanent custody hearing was limited to supervised visitation. Mother was never permitted to have unsupervised visits in her home because she had not been consistent with her mental health treatment and had been unable to stabilize her mood swings. She also continued to have a variety of adult men and women staying in her home, most of whom were unknown to MCJFS and some of whom had criminal histories. The trial court expressed concern that Mother appeared to put her own needs ahead of those of S.B. by engaging in a series of romances with inappropriate men, rather than concentrating on the reunification goals of the case plan. The court further emphasized that by bringing criminals into her home and engaging in criminal activity herself, Mother's home continued to be an unsuitable environment that would expose S.B. to crime and, given her repeated convictions, there was a risk that she would abandon him due to incarceration.

{¶12} MCJFS was particularly concerned about Mother's involvement with a man named Roger, who had an extensive history of violent crimes. Mother repeatedly told the agency that Roger was out of her life, but he was observed at her home repeatedly. During this

case, Roger was absent from Mother's life only while he was incarcerated, first for a thirty-day sentence and later during a one-year sentence. The caseworker expressed further concern that, in addition to Roger, Mother was involved with a series of different men, each of whom appeared to be residing in her home during their romantic involvement.

{¶13} Mother's interaction with S.B. was affected by her unstable mental health. As noted already, Mother does not dispute the trial court's finding that she suffers from a chronic mental illness that prevented her from providing a suitable home for her child at the time of the permanent custody hearing or within the next year. See R.C. 2151.414(E)(2). Although Mother regularly visited S.B. and her interaction was observed to be fairly positive, the in-home service provider who worked with Mother on parenting skills expressed concern about Mother's ability to behave appropriately with S.B. without continual redirection. In fact, she testified that Mother was receptive to redirection of her inappropriate behavior only "some of the time[.]" The witness further explained that, when Mother did not respond to her suggestions, she often did not know whether Mother was simply not listening to her or whether Mother's ability to respond was affected by her mental illness.

{¶14} Although Mother has been diagnosed with bipolar disorder, panic disorder, post-traumatic stress disorder, and borderline personality disorder, the concern about her inability to stabilize her mental health focused primarily on the diagnosis of bipolar disorder. According to her former therapist, Mother requires ongoing counseling, once or twice a week, and medication management with a psychiatrist to stabilize her mood swings. During the pendency of this case, however, Mother did not receive counseling as often as needed, as she saw her counselor only about twice a month. Moreover, she was not able to stabilize her mood swings through

medication management because she continued to have shifts between periods of mania and extreme depression.

{¶15} The agency's concern about Mother becoming involved with and opening her home to a series of men who were unknown to MCJFS was further magnified by evidence that Mother relied on the men in her life to make her feel safe and protect her from her suicidal tendencies. Mother admitted that, rather than reaching out to mental health professionals when she needed help with extreme depression, she would stay at home under the watch of her then-boyfriend, where she felt safe. During one visit by a home service provider, Mother was observed wandering around aimlessly, appearing to be depressed. Her boyfriend was hiding sharp objects in the home because he feared that Mother would attempt to harm herself.

{¶16} On April 11, 2011, the boyfriend actually pried pills from Mother's hand to prevent her from overdosing on medication. Because Mother had acted on her suicidal thoughts, she was admitted to a hospital psychiatric ward for two days. During her psychiatric evaluation, she admitted that her bipolar mood swings were not regulated, that she was having trouble sleeping, and that she was having both suicidal and homicidal thoughts. At that time, she had been under the care of the same psychiatrist for two years and the same counselor for several months, yet she did not reach out to either of them for help when she was feeling suicidal.

{¶17} After her release from the hospital, Mother continued in counseling on an inconsistent basis with the same therapist for approximately three more months, but she stopped seeing that counselor approximately one month before the permanent custody hearing. Although Mother told the caseworker that she had transportation problems and planned to start seeing another therapist, at the time of the permanent custody hearing, Mother was not involved in therapy with any mental health professional.

{¶18} Because S.B. was less than two years old at the time of the permanent custody hearing, the guardian ad litem spoke on his behalf. She opined that permanent custody was in S.B.'s best interest due to Mother's failure to stabilize her serious mental health problems. The guardian expressed particular concern that Mother had failed to commit to regular mental health treatment and that, at the time of the hearing, she was not engaged in any therapy. The guardian further emphasized that S.B. was bonded with his foster family and was doing very well in that stable environment.

{¶19} S.B.'s custodial history included the first six months of his life that were spent in Mother's custody in an unstable environment that had already led to the removal of his older half-sibling from the home. For the year prior to the hearing, S.B. resided with the same foster family that included his older half-sibling, A.P., and the foster parents' six-year-old son. S.B. had adjusted well to the only home that he had ever known and had become bonded with his half-sibling, as well as the foster parents and their own child.

{¶20} Finally, there was evidence to support the trial court's conclusion that S.B. was in need of a legally secure permanent placement and that such a placement would only be achieved by granting MCJFS permanent custody. S.B. had been living in a temporary placement for more than a year and MCJFS presented substantial evidence that Mother was not able to provide him with a suitable home at that time or any time in the foreseeable future. There were also no suitable relatives who were willing and able to provide S.B. with a safe and stable home.

{¶21} There was substantial evidence from which the trial court could conclude by clear and convincing evidence that permanent custody was in the best interest of S.B. Consequently, we cannot say that the trial court lost its way or created a manifest miscarriage of justice by placing S.B. in the permanent custody of MCJFS. Mother's assignment of error is overruled.

III.

{¶22} Mother's assignment of error is overruled. The judgment of the Medina County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

MOORE, P. J.
CARR, J.
CONCUR

APPEARANCES:

JOSEPH F. SALZGEBER, Attorney at Law, for Appellant.

JENNIFER A. MOORE, Attorney at Law, for Appellee.

JENNIFER D. MAYTAC, Guardian ad Litem.